# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MECCA ALLAH SHAKUR,
      *Plaintiff*,

      v.

DISCIPLINARY HEARING OFFICER
LIEUTENANT MCNEIL, CAPTAIN
SHEBENAIS, STATE TROOPER
GARNETT, DISTRICT ADMINISTRATOR
EDWARD MALDONADO,
ADMINISTRATIVE REMEDY
COORDINATOR KING, LEVEL TWO
ADMINISTRATIVE COORDINATOR
BLANCHARD, COUNSELOR COREY,
CORRECTIONAL OFFICER DEITER,
DEPUTY WARDEN NUNEZ, WARDEN
FAUCHER, & COMMISSIONER ROLLIN
COOK,
      *Defendants*.

No. 3:20-cv-708 (VAB)

## INITIAL REVIEW ORDER

On May 21, 2020, Mecca Allah Shakur ("Plaintiff"), *pro se* and currently incarcerated in

the custody of the Department of Correction ("DOC") at Corrigan-Radgowski Correctional

Center ("Corrigan"),[1] filed this Complaint[2] alleging civil rights violations under 42 U.S.C. §

1983, in connection with two incidents at Corrigan in 2018 and in 2019. He asserts claims of

Fourteenth Amendment, First Amendment, and Eighth Amendment violations against

Disciplinary Hearing Officer Lieutenant McNeil, Captain Shebenais, State Trooper Garnett,

---

[1] The Court takes judicial notice of the record on the Department of Correction website for Mr. Shakur's inmate number 171513, which reflects that Mr. Shakur is serving a sentence of 999 Years, 99 Months, and 999 days. http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=171513.

[2] Mr. Shakur is proceeding *in forma pauperis*. Mot. to Proceed In Forma Pauperis, ECF. No. 2 (May 21, 2019); Order, ECF No. 7 (May 27, 2020).

District Administrator Edward Maldonado, Administrative Remedy Coordinator King, Level

Two Administrative Coordinator Blanchard, Counselor Corey, Correctional Officer Deiter,

Deputy Warden Nunez, Warden Faucher, and Commissioner Rollin Cook[3] in their individual

and official capacities. Compl., ECF No. 1 (May 21, 2020). He seeks damages and declaratory

and injunctive relief.

For the following reasons, Mr. Shakur's Complaint will be **DISMISSED**.

This dismissal is without prejudice to Mr. Shakur filing an Amended Complaint by

**September 18, 2020**.

## I.    FACTUAL BACKGROUND[4]

On September 18, 2018, at 9:20 a.m., Mr. Shakur was allegedly approached by another

inmate named Patrick Marr, who allegedly is an active ranking member of the Los Solido Gang.

Compl. ¶ 16. Mr. Marr allegedly attempted to extort Mr. Shakur for his television and half of his

pay for his job as the "Laundry Man." *Id.*

After Mr. Shakur allegedly refused, Mr. Marr allegedly tried to fight him. *Id.* Mr. Shakur

allegedly walked away and went into the laundry room. *Id.* As Mr. Marr allegedly was speaking

loudly and making a scene, Correction Officer Skelton allegedly took notice of Mr. Marr's

conduct and secured him in his cell. *Id.* He later allegedly informed Mr. Shakur that he also

---

[3] Mr. Shakur spells Commissioner Rollin Cook's name as "Rolland" in the Complaint. *See* Compl. at 1. Public records show, however, that the correct spelling is "Rollin." *See* Press Release, Office of Governor Ned Lamont, Gov.-Elect Lamont Nominates Rollin Cook to Serve as Commissioner of the Department of Correction (Dec. 26, 2018), https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2018/Gov-Elect-Lamont-Nominates-Rollin-Cook-to-Serve-as-Commissioner-of-the-Department-of-Correction. The Court therefore directs the Clerk to revise the docket to reflect that the correct spelling of Defendant Cook's first name: Rollin.

[4] All factual allegations are drawn from the Complaint. Compl. Although some of the allegations are difficult to discern, the Court recounts the facts to the best of its ability. The Court has summarized Mr. Shakur's allegations, but it has still considered all of the factual allegations of the Complaint.

needed to be locked up in his cell because Mr. Marr had allegedly expressed his intent to assault Mr. Shakur. *Id.* Mr. Shakur allegedly was secured in his cell without problems. *Id.*

A few minutes later, Lieutenant Potts allegedly arrived at the unit on the advice of Correction Officer Skelton. *Id.* ¶ 17. He allegedly determined that Mr. Marr should move to another unit. *Id.*

At approximately 11:20 a.m., Correction Officer Deiter allegedly opened all of the cells on the bottom tier for inmates to enter dining hall for lunch. *Id.* Mr. Marr allegedly proceeded to enter Mr. Shakur's cell and threaten him with what appeared to be a razor. *Id.* ¶ 19. Mr. Shakur allegedly defended himself against Mr. Marr's attack. *Id.* at ¶ 20.

Thereafter, Mr. Shakur allegedly was restrained by custody staff, escorted out the cell, and placed against the wall. *Id.* ¶ 21. Mr. Shakur allegedly was escorted to the medical unit by custody staff, although he had problems walking due to his injuries. *Id.* ¶ 22. After he was checked for injuries, Mr. Shakur allegedly was approved for placement in the Restrictive Housing Unit ("RHU"). *Id.*

At approximately 12:33 p.m., the state trooper unit allegedly was contacted. *Id.* ¶ 23. Later, custody staff allegedly gave Mr. Shakur an interview statement paper and asked him to give a statement, although he could refuse to do so. *Id.* ¶ 24. Mr. Shakur allegedly recounted his earlier experience with Mr. Marr that led to Mr. Marr's alleged attack on Mr. Shakur. *Id.*

Later that day, Correction Officer Cassidy allegedly brought Mr. Shakur a Disciplinary Report issued by Correction Officer Skelton for fighting. *Id.* ¶ 26. Mr. Shakur allegedly submitted a complaint to Warden Faucher, which described the incident and how he was being disciplined for defending himself. *Id.* at ¶ 27.

On September 19, 2018, Disciplinary Report Investigator Nemeth investigated the Disciplinary Report. *Id.* ¶ 28. Mr. Shakur allegedly decided to go to a hearing and selected Counselor Corey as his advocate/advisor. *Id.*

Approximately a day later, Mr. Shakur allegedly was brought to the RHU interview room to meet with Counselor Corey, who wrote down what Mr. Shakur said. *Id.* ¶ 29. Mr. Shakur allegedly told Counselor Corey about the incident and recommended that he view the video from 9:20 AM on September 18, 2020. *Id.*

On September 27, 2018, Mr. Shakur allegedly was brought to his Disciplinary Hearing before Hearing Officer Lieutenant McNeil. *Id.* ¶ 30. Mr. Shakur allegedly was informed that his Advocate/Advisor Counselor Corey had been replaced by Advocate/Advisor Counselor O'Leary. *Id.* Although Mr. Shakur allegedly protested, Lieutenant McNeil allegedly stated that it was routine. *Id.* When Lieutenant McNeil turned to Counselor O'Leary as it was her turn to speak, she allegedly stated that she did not know what to do because it was her first hearing. *Id.* Lieutenant McNeil allegedly told her to read the Advocate/Advisor report in her hand. *Id.*

As Counselor O'Leary read Mr. Shakur's statement that he fought back in self-defense, Lieutenant McNeil allegedly interrupted her and asked whether Mr. Shakur had stated he fought back. *Id.* ¶ 31. Counselor O'Leary allegedly answered in the affirmative. *Id.* Lieutenant McNeil then allegedly stated that he found Mr. Shakur guilty because Mr. Shakur had admitted to engaging in a physical altercation. *Id.* Although Mr. Shakur protested, Lieutenant McNeil allegedly did not review further evidence and advised Mr. Shakur that he could file an appeal about the hearing and his guilty finding to the District Administrator. *Id.* at ¶ 31.

Mr. Shakur allegedly received punitive segregation of ten days, loss of commissary of forty-five days, loss of visits of forty-five days, and loss of statutory good time credit or Risk Reduction Earned Credit ("RREC") of forty-five days. *Id.* at 43 ¶ 31.

Mr. Shakur allegedly filed an appeal of the disciplinary findings on the basis of several procedural and substantive grounds. *Id.* ¶ 31.

On October 4, 2018, Mr. Shakur allegedly was arraigned at Norwich Superior Court on criminal charges for disorderly conduct and failure to submit to fingerprinting. *Id.* ¶ 32. He allegedly pleaded not guilty. *Id.* The next day, he allegedly was served with a "Notice of Speedy Trial Notification" and a "Request for Disposition Form." *Id.* ¶ 33. On November 9, 2018, the Superior Court entered a "*Nolle*" in his case pending in Norwich Superior Court. *Id.* ¶ 35.

On October 17, 2018, Administrative Coordinator Blanchard allegedly completed her investigation of Mr. Shakur's disciplinary appeal and provided her disposition for District Administrator Maldonado to review and sign. *Id.* ¶ 34. Mr. Shakur's appeal allegedly was denied. *Id.*

On October 26, 2019, an unsentenced inmate, Shaun Jones, who had been housed with Mr. Shakur, allegedly asked Mr. Shakur to beat him up so that he could file a lawsuit.[5] *Id.* ¶ 36. He allegedly promised to put money from the lawsuit into Mr. Shakur's account. *Id.* Mr. Shakur allegedly refused. *Id.* Mr. Jones allegedly continued to request that Mr. Shakur beat him up, but Mr. Shakur allegedly continued to refuse. *Id.* at ¶ 37.

At evening recreation, Mr. Shakur allegedly noticed that Mr. Jones had stayed in the cell and covered the window with paper. *Id.* ¶ 38. Mr. Shakur allegedly knew that Mr. Jones was either breaking his television or his Gameboy. *Id.* When Mr. Jones came out of the cell and went

---

[5] Although Mr. Shakur's Complaint indicates a date of October 26, 2018, the exhibits attached to the Complaint reflect the date of October 26, 2019, instead. *See id.* ¶¶ 52–58.

to the phone, Mr. Shakur allegedly went back into the cell, closed the door, and noticed that Mr. Jones had all of his property packed. *Id.* Mr. Jones allegedly later returned to the cell and told Mr. Shakur that he either fight him or lose everything. *Id.* ¶ 39. Mr. Jones allegedly threw Mr. Shakur's toiletries in an attempt to get him to fight him. *Id.* Finally, a correction officer allegedly called a Code Blue; as responding correction officers arrived, Mr. Jones allegedly rushed at Mr. Shakur, thereby allegedly forcing Mr. Shakur to defend himself. *Id.*

After the correction officers controlled the situation, Mr. Shakur allegedly was brought to the RHU and given a Disciplinary Report for fighting. *Id.* ¶ 40. After Mr. Shakur allegedly met with the Disciplinary Investigator, a Disciplinary Process Summary Report allegedly was issued on October 29, 2019. *Id.* ¶ 41. While these charges allegedly were dismissed against Mr. Shakur, Mr. Shakur still allegedly received punitive segregation of five days, a recreation loss of fifteen days, a visitation loss of thirty days, and a Risk Reduction Earned Credit ("RREC") loss of thirty days. *Id.* at 54 ¶ 41. Mr. Shakur allegedly wrote to the RHU manager about the theft of his property. *Id.*

On November 7, 2019, Mr. Shakur allegedly submitted a complaint to Deputy Warden Nunez, regarding the October 26, 2019 incident and arguing he should not have been placed in a cell with Mr. Jones. *Id.* ¶ 43.

On November 25, 2019, Mr. Shakur allegedly submitted an Inmate Request form to Deputy Warden Cotta, explaining that he was being disciplined for defending himself and requesting a response from Deputy Warden Cotta. *Id.* ¶ 45. On December 8, 2019, Mr. Shakur allegedly submitted an Inmate Request to Warden Corcella, explained that he had been improperly disciplined for acting in self-defense, and requested Warden Corcella's response to facilitate his exhaustion of his administrative remedies. *Id.* ¶ 46.

On December 18, 2019, Deputy Warden Nunez allegedly responded to the complaint Mr. Shakur had sent to Warden Corcella. *Id.* ¶ 47. Deputy Warden Nunez allegedly stated: "Due to the fact you pled guilty to DR Inv. Aponte, this matter is considered closed." *Id.* at 63 ¶ 47.

On December 30, 2019, Mr. Shakur allegedly submitted an administrative remedy ("First Grievance"), challenging the policy that fighting is a physical altercation between two inmates, which, in effect, required him to allow another inmate to beat him to death for the situation to be considered an assault, and prevented him from defending himself from an unprovoked attack without being disciplined. *Id.* ¶ 48.

On December 30, 2019, Mr. Shakur allegedly filed a second administrative remedy ("Second Grievance") complaining about: his being housed in a cell with an unsentenced inmate; Corrigan's practices of housing unsentenced inmates with violent life-sentenced inmates; Corrigan's placement of inmates without regard to classification safety considerations; Corrigan's inadequate classification system that fails to separate violent convicted felons and unsentenced inmates charged with minor crimes; Corrigan's housing practices that force inmates to live with another inmate; and his being assaulted, which forced him to defend himself from cellmate who wanted to initiate a lawsuit. *Id.* ¶ 49.

On January 27, 2020, Administrative Grievance Coordinator King allegedly rendered the disposition rejecting Mr. Shakur's First Grievance. *Id.* ¶ 51. This disposition (allegedly signed by Warden Corcella) stated: "Per AD 9.6 Grievable Matters. All matters subject to the Commissioner's authority for which another remedy is not provided are grievable. You should have pled not guilty to the DR and used the appeal process." *Id.*

On February 24, 2020, Administrative Coordinator King allegedly provided the disposition denying Mr. Shakur's Second Grievance. *Id.* ¶ 50. The denial of the Second

Grievance (allegedly signed by Deputy Warden Nunez) stated: "Inmates both sentenced and unsentenced are routinely admitted to direct intake facilities and housed per A.D. 9.2." *Id.*

Mr. Shakur then allegedly appealed the dispositions of his First and Second Grievances. *Id.* ¶¶ 52–53. Administrative Remedies Coordinator Blanchard allegedly investigated and rendered the disposition of his Level 2 Grievances. *Id.* ¶¶ 54–55. His First Grievance allegedly was rejected because Mr. Shakur had voluntarily pled guilty and no appeal would, therefore, be permitted; and because Mr. Shakur was challenging a policy that did not exist. *Id.* ¶ 54. His Level 2 Appeal of his Second Grievance allegedly was denied because the underlying issue had already been addressed by the disposition of his First Grievance and it appeared as if Mr. Shakur was "attempting to circumvent the policies and procedures as out lined in A.D. 9.6." *Id.* at 66 ¶ 55. Both responses to his appeals for his First and Second Grievances allegedly indicated that he had exhausted his administrative remedies. *Id.* at 65–66 ¶¶ 54–55.

## II.   STANDARD OF REVIEW

Under 28 U.S.C. § 1915A(b), district courts must review prisoners' civil complaints against governmental actors and *sua sponte* "dismiss . . . any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Liner v. Goord*, 196 F.3d 132, 134 & n.1 (2d Cir. 1999) (explaining that, under the Prisoner Litigation Reform Act, *sua sponte* dismissal of frivolous prisoner complaints is mandatory); *Tapia-Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir. 1999) ("Section 1915A requires that a district court screen a civil complaint brought by a prisoner against a governmental entity or its agents and dismiss the complaint *sua sponte* if, *inter alia,* the complaint is 'frivolous, malicious, or fails to state a claim upon which relief may be granted.'" (quoting 28 U.S.C. § 1915A)).

Rule 8 of the Federal Rules of Civil Procedure requires that a plaintiff plead only "a short and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. P. 8(a)(2), to provide the defendant "fair notice of what the . . . claim is and the grounds upon which it rests," *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (internal quotation marks omitted).

Complaints filed by *pro se* plaintiffs, however, "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 41, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101-02 (2d Cir. 2010) (discussing the "special solicitude" courts afford pro se litigants).

## III.   DISCUSSION

In his Complaint, Mr. Shakur alleges violations of the Due Process Clause of the

Fourteenth Amendment, the First Amendment, and the Eighth Amendment's prohibition of cruel

and unusual punishment.

In this initial review, the Court considers the plausibility of these alleged constitutional

violations.

### A.  Fourteenth Amendment Procedural Due Process Claims

The Fourteenth Amendment's Due Process Clause "protects persons against deprivations

of life, liberty, or property." U.S Const. amend. XIV. A court must analyze a claim of violation

of procedural due process by (1) asking whether there exists a liberty or property interest of

which a person has been deprived, and (2) if so, whether the procedures followed by the State

were constitutionally sufficient. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).

In the prison context, which involves persons whose liberty interests have already been

severely restricted because of their confinement in a prison, a prisoner cannot show a cognizable

deprivation of "liberty" unless he can show that he was subject to an "atypical and significant

hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472,

484 (1995). Courts must examine the actual punishment received, as well as the conditions and

duration of the punishment. *See Davis v. Barrett*, 576 F.3d 129, 133–34 (2d Cir. 2009) (*per*

*curiam*) (requiring a magistrate judge to compare conditions of confinement to those of prisoners

in general population, as well as those in administrative and protective confinement); *Palmer v.*

*Richards*, 364 F.3d 60, 64 (2d Cir. 2004) ("Factors relevant to determining whether the plaintiff

endured an 'atypical and significant hardship' include 'the extent to which the conditions of the

disciplinary segregation differ from other routine prison conditions' and 'the duration of the

disciplinary segregation imposed compared to discretionary confinement.'" (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)).

With respect to time limits for disciplinary confinement, a prisoner who was subjected to a disciplinary term of thirty days of confinement in restrictive housing did not sustain a deprivation of a liberty interest in violation of the Fourteenth Amendment's Due Process Clause. *Sandin*, 515 U.S. at 484. This type of confinement did not give rise to a liberty as an atypical and significant hardship because "[t]he regime to which [the prisoner] was subjected . . . was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." *Id.* at 484, 486–87.

Thus, "the duration of [segregated] confinement is a distinct factor bearing on atypicality and must be carefully considered." *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir. 2000); *compare Abrams v. Erfe*, No. 17 Civ. 1570 (CSH), 2018 WL 691714, at *12 (D. Conn. Feb. 2, 2018) (holding that a twenty-day confinement in segregation alone did not constitute a sufficient deprivation of liberty subject to due process protection because the restriction imposed no "atypical and significant hardship" in relation to that plaintiff's fifty-one-year sentence of imprisonment), *with Ellerbe v. Jason*, No. 12 Civ. 580 (MPS), 2015 WL 1064739, at *5 (D. Conn. Mar. 11, 2015) (holding a long period of segregation such as more than 305 days "is sufficiently atypical to trigger due process protections." (citing *Palmer,* 364 F.3d at 65)); *see also Palmer,* 364 F.3d at 64–65 (However, "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." (quotation marks omitted)).

As a result, "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous

than usual." *Davis*, 576 F.3d at 133; *Kalwasinski v. Morse*, 201 F.3d 103,107–08 (2d Cir. 1999) (discussing factors relevant to deciding if confinement in SHU constitutes an atypical hardship).

Mr. Shakur alleges violation of his Fourteenth Amendment procedural due process rights by Lieutenant McNeil and Counselor Corey in connection with his disciplinary hearing for his September 18, 2018 offense, and against District Administrator Maldonado in upholding his guilty finding on appeal despite evidence to the contrary.

Mr. Shakur has alleged that as a result of Lieutenant McNeil's guilty finding, he received the disciplinary sanctions of punitive segregation for only ten days, loss of commissary of forty-five days, loss of visits of forty-five days, and loss of RREC credit of forty-five days. ECF No. at 43 ¶ 31. He has not alleged any facts indicating that he suffered from any atypical and significantly onerous conditions while in punitive segregation (which was of short duration) in relation to the ordinary incidents of prison life. *See Sealey v. Giltner*, 197 F.3d 578, 589 (2d Cir. 1999) (describing the conditions of a prisoner's placement in administrative segregation in a special housing unit as "doubtless unpleasant and somewhat more severe than those of general population," but affirming that "the degree of incremental harshness, endured for 101 days, is not an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life'"); *see also McClellan v. Chapdelaine*, 3:16-cv-2031 (VAB), 2017 WL 3841469, at *4–5 (D. Conn. Sept. 1, 2017) (finding loss of commissary and visiting privileges did not create a liberty interest). As he has not alleged that his punitive segregation imposed more oppressive conditions than the usual, Mr. Shakur has not alleged a plausible liberty interest as required to raise a plausible procedural due process claim in connection with his disciplinary proceedings for his offense on September 18, 2018.

To the extent that Mr. Shakur alleges a due process violation based on his disciplinary hearing stemming from his altercation with Mr. Jones on October 26, 2019, the Court must dismiss his claim as not plausible for the same reasons. Mr. Shakur alleges that the charges were dismissed but he received punitive segregation of five days, recreation loss of fifteen days, visitation loss of thirty days, and statutory RREC credit loss of thirty days. ECF No. 1 at ¶ 41, p. 54. Again, Mr. Shakur has not alleged that his punitive segregation imposed more onerous conditions than the usual, and he has not raised a plausible Fourteenth Amendment liberty interest.

Accordingly, his Fourteenth Amendment procedural due process claims will be dismissed.[6]

### B. Malicious Prosecution Claim

"Claims for false arrest or malicious prosecution, brought under [Section] 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are substantially the same as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (internal quotation marks omitted). Thus, state law provides the legal elements for such claims under Section 1983. *See Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004) ("In analyzing [Section] 1983 claims for unconstitutional false

---

[6] The Court notes that Mr. Shakur's due process challenges concern "mixed sanctions," *i.e.*, "sanctions that affect both (a) the duration of his imprisonment and (b) the conditions of his confinement." *Peralta v. Vasquez*, 467 F.3d 98, 103 (2d Cir. 2006). A Section 1983 action seeking money damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless that "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . . or called into question by a federal court's issuance of a writ of habeas corpus . . . ." *Heck v. Humphrey*, 512 U.S. 777, 487 (1994) (internal citation omitted). The Supreme Court has made clear that *Heck*'s favorable termination rule applies to challenges made under Section 1983 to procedures used in disciplinary proceedings that deprived a prisoner of RREC. *See Edwards v. Balisok*, 520 U.S. 641 (1997); *Peralta*, 467 F.3d at 103 (holding that "a prisoner subject to such mixed sanctions can proceed separately, under § 1983, with a challenge to the sanctions affecting his conditions of confinement without satisfying the favorable termination rule, *but . . . he can only do so if he is willing to forgo once and for all any challenge to any sanctions that affect the duration of his confinement*." (emphasis in original)).

arrest, we have generally looked to the law of the state in which the arrest occurred."); *Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994) ("Though section 1983 provides the federal claim, we borrow the elements of the underlying malicious prosecution tort from state law.").

For a claim of malicious prosecution under Connecticut law, the plaintiff must prove four elements: that "(1) the defendant initiated or continued criminal proceedings against the plaintiff; (2) the criminal proceeding terminated in favor of the plaintiff; (3) 'the defendant acted without probable cause'; and (4) 'the defendant acted with malice.'" *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (quoting *McHale v. W.B.S. Corp.*, 187 Conn. 444, 447 (1982)).

A plaintiff already in custody on other charges, however, cannot make a claim for false arrest or malicious prosecution under Section 1983 because there is no deprivation of liberty interests. *See, e.g.*, *Walker v. Sankhi*, 494 F. App'x 140, 143 (2d Cir. 2012) (summary order) ("[E]ven if he could overcome the presumption of probable cause, [plaintiff] could not have suffered a deprivation of liberty as a result of the Bellamy burglary charge because, throughout the pendency of that charge, he was already in custody, and remained in custody, for a completely separate burglary charge . . . .") (citing *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995) ("A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must . . . show some deprivation of liberty consistent with the concept of 'seizure'.").*see also Figueroa v. Town of N. Haven*, No. 3:17-cv-00650 (SRU), 2017 WL 6045421, at *5 (D. Conn. Dec. 6, 2017) (dismissing false arrest, false imprisonment and malicious prosecution claim where plaintiff was confined for another matter at the time of his arrest and until the arrest charges were dismissed).

Mr. Shakur alleges that State Trooper Garnett and Captain Shebenais are liable for malicious prosecution. Here, Mr. Shakur already was incarcerated at the time State Trooper

Garnett and Captain Shebenais filed and pressed charges against him, and Mr. Shakur remained in custody until those charges were *nolled.* Thus, his liberty was not restrained by the conduct of State Trooper Garnett and Captain Shebenais.

Accordingly, the malicious prosecution claim will be dismissed.

### C.    Eighth Amendment Claim

The Eighth Amendment's prohibition of cruel and unusual punishment "places restraints" and imposes duties on prison officials to provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citations omitted). Thus, the Eighth Amendment protects against punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). Although the Constitution does not require "comfortable" prison conditions, the Eighth Amendment requires prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care," and to "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832–33.

To state a deliberate indifference to health or safety claim under the Eighth Amendment, an inmate must demonstrate both an objective and a subjective element. To meet the objective element, an inmate must allege that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[ ] necessit[y]" or a "substantial risk of serious harm." *Id.* at 834 (internal quotation marks and citations omitted). To meet the subjective element, an inmate must allege that the defendant prison officials possessed culpable intent, that is, the officials knew that he faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See id.* at 834, 837. Thus, an allegation of "mere negligen[t]" conduct is insufficient. *Id.* at 835. Rather, the subjective element requires that a plaintiff allege that prison officials acted with "a mental state equivalent to subjective

recklessness, as the term is used in criminal law." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006).

Mr. Shakur alleges numerous claims of Eighth Amendment violation based on cruel and unusual punishment. He alleges that McNeil violated the Eighth Amendment by finding Mr. Shakur guilty based on his admission that he fought back, thereby denying Mr. Shakur the right to act in self-defense to an inmate's attack. Compl. ¶¶ 57–59. He alleges that Trooper Garnett and Captain Shebenais acted in violation of the Eighth Amendment in connection with the prosecution related to the incident on September 18, 2018. *Id.* ¶¶ 60–61. He further alleges that Correction Officer Deiter violated the Eighth Amendment when she opened the cell doors on the bottom tier to permit the inmates to proceed to lunch. *Id.* ¶ 71. Finally, he alleges that Warden Faucher violated the Eighth Amendment by implementing a policy that an inmate cannot fight back in self-defense, *id.* ¶ 72; and that Warden Faucher and Commissioner Cook violated the Eighth Amendment by implementing or allowing for a policy prohibiting correction officers from intervening in an inmate altercation until responding officers arrive. *Id.* ¶¶ 73, 75.

The Court construes Mr. Shakur as alleging claims against Lieutenant McNeil, Correction Officer Deiter, Warden Faucher and Commissioner Cook for depriving him of safe conditions of confinement. To the extent that Mr. Shakur alleges that Trooper Garnett and Captain Shebenais violated the Eighth Amendment based on pressing charges of disorderly conduct against him, this claim fails because Mr. Shakur has not alleged that their conduct exposed him to any deprivation of a life necessity a condition that exposed him to risk to safety.

### 1. Correction Officer Deiter

Mr. Shakur alleges that Correction Officer Deiter was aware of a chance that Mr. Marr would attack Mr. Shakur when she opened the cell doors of the bottom tier. Compl. ¶ 18. Mr.

Shakur has not, however, stated any underlying facts to suggest that Correction Officer Deiter had any knowledge or awareness of Mr. Marr's intent to harm Mr. Shakur. Because Mr. Shakur cannot rely on conclusory allegations to state a claim, s*ee Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) (stating conclusory allegations are insufficient to state a claim), Mr. Shakur has failed to allege that Correction Officer Deiter plausibly acted with a conscious disregard or deliberate indifference to Mr. Shakur's safety when she opened the cell doors to permit the inmates to proceed into the dining hall for lunch.

Accordingly, this claim against Correction Officer Deiter will be dismissed.

## 2.   Lieutenant McNeil and Warden Faucher

Mr. Shakur maintains that Lieutenant McNeil and Warden Faucher are subjecting inmates to cruel and unusual punishment by disciplining inmates for acting in self-defense, essentially a Fourteenth Amendment challenge to his disciplinary finding of guilty. Several courts have previously held, however, that an inmate has no constitutional right to self-defense in prison disciplinary proceedings. *Sharabi v. Recktenwald,* No. 15CIV2466(VEC/HBP), 2016 WL 11271875, at *3 (S.D.N.Y. Nov. 7, 2016) ("Given that there is virtually no support for such a judicially created constitutional right in the criminal law, we believe that manufacturing such a right for application in non-criminal, prison disciplinary proceedings is even less justified. . . . A right that threatens to undermine prison discipline by encouraging inmates to combat violence with more violence subverts a core prison function of ensuring order and safety within the institution." (citing cases and quoting *Rowe v. DeBruyn*, 17 F.3d 1047, 1052–53 (7th Cir. 1994))), *report and recommendation adopted*, No. 15CV2466 (VEC/HBP), 2017 WL 1957040 (S.D.N.Y. May 10, 2017).

Mr. Shakur has failed to establish a liberty interest in connection with his Disciplinary Hearings' sanctions. Because a prison official's practice or policy to impose discipline on an inmate for fighting in self-defense does not implicate a constitutional right, Mr. Shakur cannot establish an Eighth Amendment claim based on discipline imposed for this conduct.

Accordingly, this claim against Lieutenant McNeil and Warden Faucher will be dismissed.

### 3. Warden Faucher and Commissioner Cook

The Court also will dismiss as not plausible Mr. Shakur's allegations that Warden Faucher and Commissioner Cook violated the Eighth Amendment due to the practice and policy of allowing correction officers to wait to intervene in an inmate altercation until the arrival responding officers.

Administrative Directive 6.5, which governs the correction officers' use of force, provides that a DOC employee "may use physical force on an inmate to maintain discipline order, safety and security while in the performance of the employee's official duties[;]" "[s]taff may *immediately* use force and/or apply restraints when an inmate's behavior constitutes an immediate threat to self, others, property, order or the safety and security of the facility[;]" and "[p]hysical force shall be reasonably related to the degree and duration necessary to achieve its authorized objective." A.D. 6.5(4)(b)-(e) (emphasis added). Administrative Directive 6.5(5)(d) directs that prior to correctional officer use of force, "[a] correctional supervisor shall issue a last verbal warning to the inmate and advise the inmate that force shall be used to include, but not limited to chemical agents and/or canine, and provide the inmate with a reasonable amount of time to comply with lawful direction before initiating the use of physical force[;]" and "[i]n the event such measures are unsuccessful, reasonable physical force may be utilized."

In his Complaint, Mr. Shakur has not plausibly alleged that Warden Faucher and Commissioner Cook have established a practice or policy to permit correction officers to wait to intervene in an inmate altercation until the arrival responding officers. Although he has not cited to a particular Administrative Directive, he does refer to the Use of Force Report related to the incident with Mr. Marr on September 18, 2018. The Use of Force Report describes the altercation and states: "The inmates were repeatedly given verbal direction to stop fighting. When the appropriate amount of staff arrived to the scene, this Counselor entered the cell and pulled inmate Hinton [Mr. Shakur] off of Inmate Marr." Compl. at 38.

Mr. Shakur appears to base his claim against Warden Faucher and Commissioner Cook on an alleged delay by the correction officers to intervene in his altercation with Mr. Marr on September 18, 2018. But neither Warden Faucher nor Commissioner Cook is alleged to have any involvement with that incident. Mr. Shakur cannot hold a defendant monetarily liable without alleging that defendant's personal involvement in the asserted constitutional violation. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (a defendant's personal involvement in an alleged constitutional violation is a prerequisite to hold a defendant liable for an award of damages under Section 1983).

Moreover, he cannot sue a defendant for damages solely because of the Defendant's supervisory position. *See Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973) (doctrine of *respondeat superior* does not suffice for claim of monetary damages under Section 1983). He may only recover damages against a supervisory official by showing that the official was "personally involved" in the constitutional deprivation in one of five ways: (1) the official directly participated in the deprivation; (2) the official learned about the deprivation through a report or appeal and failed to remedy the wrong; (3) the official created or perpetuated a policy

19

or custom under which unconstitutional practices occurred; (4) the official was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the official failed to take action in response to information regarding the unconstitutional conduct. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (listing the same ways supervisory liability may be shown).

Because the allegations of the Complaint establish no connection between Warden Faucher and Commissioner Cook based on the untimely intervention of the correction officers, the individual and official capacity claims against Warden Faucher and Commissioner Cook will be dismissed. *Reese v. Lightner*, No. 3:18-cv-1922 (KAD), 2019 WL 2176342, at *4 (D. Conn. May 20, 2019) (dismissing official and individual capacity claims where plaintiff failed to allege allegations regarding the acts or omissions of defendants).

### D.   Violations Based on Misconduct By Administrative Remedies Coordinators and Deputy Warden Nunez

Mr. Shakur alleges that Administrative Remedies Coordinators King and Blanchard violated his First Amendment and Fourteenth Amendment rights by denying access to the administrative remedy process and access to the courts and his Eighth Amendment rights by subjecting him to cruel and unusual punishment. Compl. ¶¶ 62–68. He alleges further that Deputy Warden Nunez also violated his First and Fourteenth Amendments by denying him access to his administrative remedies. *Id.* ¶ 69.

As a preliminary matter, Mr. Shakur cannot assert a violation of prison administrative directives or administrative remedies as a constitutional claim under 42 U.S.C. § 1983. "[A] prison official's violation of a prison regulation or policy does not establish that the official has violated the Constitution or is liable to a prisoner under 42 U.S.C. § 1983." *Fine v. UConn Med.*, No. 3:18-cv-530 (JAM), 2019 WL 236726, at *9 (D. Conn. Jan. 16, 2019) (citation omitted).

"[I]nmate grievance programs created by state law are not required by the Constitution, and consequently allegations that prison officials violated those procedures do not give rise to a cognizable Section 1983 claim." *Alvarado v. Westchester Cty.*, 22 F. Supp. 3d 208, 214 (S.D.N.Y. 2014) (citations, alterations, and quotation marks omitted). "Inmates have no constitutional entitlement to grievance procedures, to receive a response to a grievance, or to have a grievance processed properly." *Schlosser v. Manuel*, No. 3:19-cv-1444 (SRU), 2020 WL 127700, at *5 (D. Conn. Jan. 10, 2020) (citing *Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (claim relating to grievance procedures "confused a state-created procedural entitlement with a constitutional right;" "neither state policies nor 'state statutes . . . create federally protected due process entitlements to specific state-mandated procedures'")).

Thus, Mr. Shakur cannot state a First Amendment or Fourteenth Amendment claim based on the alleged denial of his access to the prison administrative remedies. Even if prison officials "thwart[ed] [him] from taking advantage of a grievance process through machination, misrepresentation, or intimidation[,]" Mr. Shakur would be excused from exhausting the grievance procedure because the administrative remedies would be considered unavailable and he could still proceed to federal court. *See Ross v. Blake*, 136 S. Ct. 1850, 1858–59 (2016) (explaining exception to exhaustion requirement when administrative remedies are unavailable).

E.     **Official Capacity Claims**

Mr. Shakur has alleged his claims against Defendants in their official capacities. However, as the Court has determined that all of his claims should be dismissed as not plausible, the Court will also dismiss the official capacity claim. *See Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406–07 (S.D.N.Y. 2010) (requests for injunctive relief are remedies and are dismissed with the underlying claim).

21

**ORDERS**

For the foregoing reasons, the Court **DISMISSES** all of the claims in the Complaint as

not plausible. This dismissal is without prejudice to Mr. Shakur filing an Amended Complaint by

**September 18, 2020**.

If Mr. Shakur seeks to reallege a Fourteenth Amendment due process claim challenging

his mixed sanctions that include his loss of RREC, he must advise the Court in writing, by

**September 18, 2020**, whether he waives for all time all claims in this action relating to

disciplinary sanctions affecting the duration of his confinement (i.e., the forfeiture of the RREC)

in order to proceed with his claims challenging the disciplinary finding. The Court advises Mr.

Shakur that failure to file such a statement within the required time will be deemed to constitute

his refusal to waive those claims and will thus result in the dismissal of his Fourteenth

Amendment due process claim.


**SO ORDERED** at Bridgeport, Connecticut, this 17th day of August, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE